UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

DONALD DAVIS,

                Plaintiff,                Civil No. 13-345 (NLH/JS)

v.                               **OPINION**

LOWE'S HOME CENTERS, INC.,
et al.,

                Defendants.

_____

**APPEARANCES:**

Michael H. Berg, Esquire
Berg & Pearson, PC
59 North Broad Street
Woodbury, New Jersey 08096

      *Counsel for Plaintiff*

Vito A. Gagliardi, Jr., Esquire
Kerri Ann Wright, Esquire
Raquel Sara Lord, Esquire
Porzio, Bromberg & Newman
100 Southgate Parkway
Morristown, New Jersey 07962

      *Counsel for Defendant Lowe's Companies, Inc.*

**HILLMAN, District Judge**

     This is an employment discrimination action brought by Plaintiff, Donald Davis, alleging that his former employer, Defendant Lowe's Companies, Inc., failed to appropriately accommodate Plaintiff after he suffered a workplace injury. Presently before the Court is the motion [Doc. No. 24] of Defendant for summary judgment pursuant to Federal Rule of Civil

1

Procedure 56.[1]  The Court has considered the submissions of the parties and has decided this matter pursuant to Federal Rule of Civil Procedure 78.

For the reasons that follow, Defendant's motion for summary judgment is denied.

I.  **JURISDICTION**

On October 18, 2012, Plaintiff filed a civil action in the Superior Court of New Jersey, Law Division, Gloucester County, alleging violations of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 et seq. (hereafter, "NLJAD").  Defendant removed the action to this Court on the basis of diversity jurisdiction.  Plaintiff is a New Jersey citizen, and Defendant is a North Carolina corporation with its principal place of business in Mooresville, North Carolina. (Not. of Removal ¶¶ 9, 10.)  The amount in controversy exceeds $75,000.  (Id. ¶ 11.)  Accordingly, the Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

---

[1] Plaintiff initially named Fred Cassi, the manager of the Lowe's store in Mantua, New Jersey, as a defendant in this matter. Plaintiff and Defendant stipulated to the dismissal of Mr. Cassi as a party on or about December 27, 2012.  (Not. of Removal ¶ 4.)  Plaintiff also named a number of fictitious defendants who were never identified or served.  Therefore, at this time, Lowe's is the only defendant in this action.

II.  **BACKGROUND**

    A.  **Plaintiff's Employment Background**

    Prior to becoming employed by Defendant, Plaintiff worked as a carpenter and a contractor.  (Pl.'s Supp. Statement of Disputed Material Facts in Opp. to Def.'s Mot. for Summ. J. (hereafter, "Pl.'s SOF") ¶ 1; Def.'s Response to Pl.'s Supp. Statement of Disputed Material Facts in Opp. to Def.'s Mot. for Summ. J. (hereafter, "Def.'s Opp.") ¶ 1.)  Plaintiff worked in construction "practically his entire working life[,]" including working as a self-employed sole proprietor performing home improvement.  (Pl.'s SOF ¶ 2-3; Def.'s Opp. ¶ 2-3.)  As a sole proprietor, Plaintiff replaced doors, fixed dry wall, repaired leaks, and performed other types of home improvements. (Pl.'s SOF ¶ 3; Def.'s Opp. ¶ 3.)

    Plaintiff was hired by Defendant on or about September 13, 2008 as a Customer Service Associate in the Electrical Department at the Mantua, New Jersey store.  (Def.'s Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. (hereafter, "Def.'s SOF") ¶ 1; Pl.'s Opp. to Def.'s Statement of Undisputed Material Facts (hereafter, "Pl.'s Opp.) ¶ 1.) Plaintiff's hourly rate of pay when he was hired was $14.20. (Def.'s SOF ¶ 1; Pl.'s Opp. ¶ 1.)  In or about March 2009, Plaintiff applied for and received a promotion to the position

of Plumbing Pro, with a commensurate raise in his hourly rate of pay to $15.62.  (Def.'s SOF ¶ 3; Pl.'s Opp. ¶ 3.)

In or about January 2010, Plaintiff was again promoted, having applied for and received a position as a Project Specialist Exteriors (hereafter, "PSE"), with an increase in hourly rate of pay to $16.26.  (Def.'s SOF ¶ 4; Pl.'s Opp. ¶ 4.) As a PSE, Plaintiff was required to sell exterior products, such as windows, doors, siding, roofs, and fencing.  (Pl.'s SOF ¶ 8; Def.'s Opp. ¶ 8.)  Plaintiff also went to customers' homes to prepare estimates for the installation of such products as windows, fencing, and roofing material.  (Pl.'s SOF ¶ 9; Def.'s Opp. ¶ 9.)

The position of PSE was subsequently eliminated at the Mantua store, at which time Plaintiff was transferred to the position of Sales Specialist in the Flooring Department. (Def.'s SOF ¶ 5; Pl.'s Opp. ¶ 5.)[2]  There was no pay adjustment

---

[2] The date on which Plaintiff was transferred to the Flooring Department is unclear.  Defendant contends that Plaintiff was transferred in August 2011, and a Personnel Data Change Form confirms that the effective date of transfer was August 6, 2011. (Def.'s SOF ¶ 5; Cert. of Raquel S. Lord, Esq., Ex. F.) Plaintiff's injury, however, occurred on July 26, 2011.  (Def.'s SOF ¶ 15; Pl.'s Opp. ¶ 15.)  The parties appear to agree that Plaintiff had been assigned to the Flooring Department at the time he was injured, so Plaintiff would have been transferred to the Flooring Department at least as of July 26, 2011, even though the paperwork indicates that the effective date of transfer was August 2011.

associated with Plaintiff's transfer.  (Def.'s SOF ¶ 5; Pl.'s Opp. ¶ 5.)

**B.  Plaintiff's Workplace Injury**

On or about July 26, 2011, Plaintiff injured his right shoulder at work when he and another employee were lifting a box that was approximately one foot off of the ground and weighed approximately 150 pounds.  (Def.'s SOF ¶¶ 15, 16; Pl.'s Opp. ¶¶ 15, 16.)  The store Human Resources Manager, Lori Weatherill, completed a Worker's Compensation Initial Injury Report for Plaintiff and sent him to a worker's compensation doctor. (Def.'s SOF ¶ 17; Pl.'s Opp. ¶ 17.)  The worker's compensation doctors placed temporary restrictions on Plaintiff's physical activities.  (Def.'s SOF ¶ 18; Pl.'s Opp. ¶ 18.)  On August 30, 2011, Plaintiff had surgery on his shoulder and thereafter took a leave of absence to recover.  (Def.'s SOF ¶ 19; Pl.'s Opp. ¶ 19.)

Upon Plaintiff's return to work, and due to his temporary restrictions, Plaintiff was assigned to greet customers at the front door.  (Def.'s SOF ¶ 20; Pl.'s Opp. ¶ 20.)  Plaintiff's title remained a Flooring Specialist at the same rate of pay. (Def.'s SOF ¶ 20; Pl.'s Opp. ¶ 20.)   Plaintiff contends that in addition to greeting customers, his duties included assignment to various departments within the store, including the Flooring Department.  (Pl.'s Opp. ¶ 20.)  Defendant disputes that

Plaintiff was assigned to various departments, but it is undisputed that Plaintiff was permitted to walk around the store and assist customers in various departments upon returning to work after his surgery.  (Pl.'s SOF ¶ 52; Def.'s Opp. ¶ 52).

On or about March 21, 2012, Plaintiff reached maximum medical improvement.  (Def.'s SOF ¶ 22; Pl.'s Opp. ¶ 22.)  At that time, the restrictions on Plaintiff's physical activity were deemed to be permanent.  (Def.'s SOF ¶ 23; Pl.'s Opp. ¶ 23.)  The parties stipulate that as of March 21, 2012, Plaintiff's work restrictions were as follows: "No lifting greater than 10 pounds above chest level" and "No climbing." (Cert. of Raquel S. Lord, Esq. (hereafter, "Lord Cert."), Ex. Y ¶ 9.)  On April 25, 2012, Plaintiff was further restricted to the following: "No pushing, pulling, moving, lifting or carrying greater than 50 pounds." (Id. ¶ 10.)  These work restrictions remained unchanged from April 25, 2012 until the date of Plaintiff's separation from work with Defendant.  (Id. ¶ 11.)

### C.   The Interactive Process

In late March 2012, Plaintiff met with Weatherill to discuss the Americans With Disabilities Act (hereafter, "ADA") accommodation process.  (Def.'s SOF ¶ 24; Pl.'s Opp. ¶ 24.)  Ms. Weatherill provided Plaintiff with an ADA Accommodation Request form to complete.  (Def.'s SOF ¶ 26; Pl.'s Opp. ¶ 26.)

6

Plaintiff completed the ADA Accommodation Request form on March 28, 2012, stating as follows therein:

> I had a tear of Rotator Cuff.  After surgery, I can't lift my right arm and can't lift any more than 10 lbs. to chest.  And can not climb.  I would like a job to accommodate this.

(Lord Cert., Ex. K.)  Plaintiff also noted on the form, in connection with a request for any additional information that would be useful in processing the accommodation request, that he still had "full use of left arm" and that he had been employed by Defendant since September 13, 2008.  (Id.)

Weatherill then reached out to the Area Human Resources Manager, Karen Ortley, to discuss accommodating Plaintiff's permanent restrictions.  (Def.'s SOF ¶ 29; Pl.'s Opp. ¶ 29.) Ortley reviewed documentation relative to Plaintiff's medical condition and contacted Brenda Ricketts, a Lowe's Accommodation Specialist, in an effort to identify an accommodation for Plaintiff.  (Def.'s SOF ¶¶ 30-31; Pl.'s SOF ¶¶ 30-31.)  Ortley discussed with Weatherill various positions that were available that would accommodate Plaintiff's permanent restrictions. (Def.'s SOF ¶ 32; Pl.'s SOF ¶ 32.)  These positions included cashier and a Customer Service Associate (hereafter, "CSA") at the front desk.  (Def.'s SOF ¶ 34; Pl.'s Opp. ¶ 34.)

On May 30, 2012, Ortley instructed Weatherill to offer Plaintiff the position of a CSA at the front desk because it had

a higher rate of pay than the cashier position.  (Def.'s SOF ¶¶ 34, 40; Pl.'s Opp. ¶¶ 34, 40; Lord Cert., Ex. M.)  This position, however, had a lesser pay rate than Plaintiff's pre-injury position as a Sales Specialist in the Flooring Department.  (Def.'s SOF ¶ 49; Pl.'s Opp. ¶ 49.)

On or about June 2, 2012, Plaintiff met with Weatherill and Store Manager Fred Cassi, at which time he was offered the position as a CSA at the front desk.  (Def.'s SOF ¶ 41; Pl.'s Opp. ¶ 41; Lord Cert., Ex. O.)  Plaintiff was advised that the CSA position would accommodate his physical restrictions.  (Def.'s SOF ¶ 43; Pl.'s Opp. ¶ 43.)  Plaintiff was provided with an "Interactive Process Form," which described the accommodation offered:

> Lowe's is offering you the position as Customer Service Desk Associate.  Lowe's agrees to accommodate your request with no climbing, no lifting more than 50 lbs and no lifting more than 10 lbs above chest level."

(Lord Cert., Ex. N.)  Plaintiff wrote on the form that he could not accept the position "because of the drop in pay[,]" and noted that if a position as a PSE opened he would like to take that position.  (Id.)  Cassi suggested that Plaintiff think about the new position before making a decision.  (Def.'s SOF ¶ 45; Pl.'s Opp. ¶ 45.)  After the meeting, Weatherill completed "Interactive Meeting Notes," in which she noted that Plaintiff

had suggested the PSE position but such position did not meet his accommodations.  (Lord Cert., Ex. O.)

Weatherill and Cassi then met with Plaintiff on June 5, 2012.  (Def.'s SOF ¶ 46; Pl.'s SOF ¶ 46.)  The "Interactive Meeting Notes" completed by Weatherill indicate that the parties again discussed the CSA front desk position but Plaintiff would not accept the position because he could not afford to live on the reduced salary.  (Lord Cert., Ex. P.)  Plaintiff decided not to continue his employment with Defendant.  (Def.'s SOF ¶ 48; Pl.'s Opp. ¶ 48.)

On October 18, 2012, Plaintiff filed suit against Defendant alleging that Defendant failed to provide a reasonable accommodation for his workplace restrictions and that Defendant failed to engage in the interactive process in an attempt to provide a reasonable accommodation, in violation of the NJLAD. Plaintiff thereafter filed an amended complaint and a second amended complaint.  Defendant now seeks summary judgment on both counts of Plaintiff's second amended complaint.


III. <u>**DISCUSSION**</u>

    **A. Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

9

affidavits, if any,' . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(citing Anderson, 477 U.S. at 255, 106 S. Ct. 2505).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323, 106 S. Ct. 2548 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); see also Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.")(citing Celotex, 477 U.S. at 325, 106 S. Ct. 2548).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324, 106 S. Ct. 2548. A "party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s.]'" Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). For "the non-moving party[ ] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Cooper v. Sniezek, 418 F. App'x 56, 58 (3d Cir. 2011) (citing Celotex, 477 U.S. at 322, 106 S. Ct. 2548). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that

contradict those offered by the moving party.  <u>Anderson</u>, 477
U.S. at 257, 106 S. Ct. 2505.

   **B. Analysis**

   **1. Disparate Treatment Claim**

   In analyzing a claim of disparate treatment under the
NJLAD, New Jersey courts utilize the burden-shifting framework
set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93
S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  <u>Gerety v. Atl. City
Hilton Casino Resort</u>, 184 N.J. 391, 399, 877 A.2d 1233 (N.J.
2005).  To prove a <u>prima facie</u> case of disability
discrimination, a plaintiff must demonstrate that he:

>   (1)   is disabled or is perceived to have a
>         disability;
>   (2)   was qualified for the position;
>   (3)   was subjected to an adverse employment
>         action; and
>   (4)   the employer sought to, or did fill the
>         position with a similarly-qualified
>         person.

<u>Victor v. State</u>, 203 N.J. 383, 409-10, 4 A.3d 126 (N.J. 2010);
<u>Gerety</u>, 184 N.J. at 399, 877 A.2d 1233.  Once the plaintiff
satisfies his burden, the employer then must prove a legitimate,
non-discriminatory reason for the employment action.  <u>Gerety</u>,
184 N.J. at 399, 877 A.2d 1233.  The plaintiff can respond by
showing that the reason proffered by the employer was merely
pretext for the discrimination.  <u>Id.</u>

### a.   Qualifications for Position of Flooring Specialist

Defendant moves for summary judgment on the basis that Plaintiff fails to make out the second prong of the McDonnell Douglas standard, arguing that Plaintiff was not able to perform the job given his permanent physical restrictions.  Resolution of the second prong "often turns on what are the 'essential functions of the job.'"  Melton v. Resorts Int'l Hotel, Inc., Civ. A. No. 11-6449, 2014 WL 5341929, at *4 (D.N.J. Oct. 20, 2014).  "Essential functions of a position do not include marginal functions."  Id.

Plaintiff contends that despite his permanent physical restrictions, he could still perform the essential functions of his job as Sales Specialist in the Flooring Department, which included selling a flooring job, showing samples of carpet and flooring product, sending contractors to customers' homes to take measurements, and essentially "selling the job."  (Pl.'s SOF ¶ 13.)  Defendant does not deny that these are the primary duties of a Sales Specialist in the Flooring Department, but also considers lifting and moving products, including loading products into a customer's cart, to be part of the selling process.  (Def.'s Opp. ¶ 13.)  Defendant argues that Plaintiff could not lift and move products into a customer's cart or

perform other tasks in the Flooring Department, and was therefore unable to perform the essential functions of the job.

For the reasons that follow, the Court concludes that there exists a genuine factual dispute on the issue of whether Plaintiff could conduct the essential functions of his job in the Flooring Department.  Plaintiff's physical limitations are not in dispute.  Nor is there a dispute that Plaintiff could have assisted customers in the Flooring Department at least in part, in that he could have provided product information, used the computer, placed orders, and answered questions.  (See, e.g., Lord Cert., Ex. T at 37:6-15.)  The disputed issues are whether lifting and climbing a ladder were essential functions to the position of Sales Specialist in the Flooring Department and, if so, whether Plaintiff could perform these essential functions given his permanent physical restrictions.

### i.   Lifting More than Fifty Pounds

As a starting point, the Court looks to Defendant's written job description for the position of Sales Specialist.  This job description is not specific to Flooring Specialists but applies to Sales Specialists in all departments.  (See Lord Cert., Ex. G.)  The description provides that a Sales Specialist is "[r]esponsible for providing superior customer service, achieving sales budgets in assigned area [and] merchandise maintenance," "[g]reet[ing] and acknowledg[ing] all customers in

14

a friendly, professional manner and provid[ing] quick, responsive customer service" and being "[r]esponsible for all other duties as assigned." (Cert. of Raquel S. Lord, Esq. (hereafter, "Lord Cert."), Ex. G.)  Furthermore, the position of Sales Specialist has certain physical requirements which include, inter alia, the following: (1) an ability to "move throughout all areas of the store;" (2) an ability to move objects "up to and exceeding 200 pounds with reasonable accommodations[;]" and (3) an ability to "stand, bend, stoop, kneel, reach, twist, lift, push, pull, climb, balance, crouch, handle and move items weighing up to 50 pounds without assistance[.]"  (Id.)[3]

The Court also looks to the actual work experience of Defendant's employees in considering the essential functions of the job.  See Sturm v. UAL Corp., No. Civ. A. 98-264, 2000 WL

---

[3] In addition to Sales Specialists, Defendant also employs Customer Service Associates (hereafter, "CSAs") and department managers.  The written description for the position of Sales Specialist is different from that of a "CSA Sales Floor." Although both positions contain identical physical job requirements, the general job description of a "CSA Sales Floor" employee is to "[p]rovide superior customer service by assisting customers in selection, demonstration and purchase of product including special orders and installations[,]" to "[k]eep shelves fully stocked, fronted according to planogram and correctly priced[,]" to "[g]reet and acknowledge all customers in a friendly, professional manner and provide quick, responsive customer service[,]" and to be "[r]esponsible for all other duties as assigned."  (Cert. of Michael H. Berg, Esq. in Opp. to Def.'s Mot. for Summ. J., Ex. 21.)

1300396, at *5 (D.N.J. Sept. 5, 2000).  The testimony of several of Defendant's employees suggests that lifting products into a customer's cart and, if necessary, into their car, is part of the sales experience.  In this regard, the store manager, Fred Cassi, testified that customers must be assisted with lifting. (Lord. Cert., Ex. S at 31:8-12.)  The store Human Resources Manager, Lori Weatherill, testified that employees are "there to service the customer from the beginning of the project to the end of the project which is cutting carpet, lifting tile, lifting hardwood floor."  (Lord Cert., Ex. U at 65:1-6.)

The flooring department manager, Holly Nieradka, testified that the main responsibility in the flooring department was to "take care of the customers," by "providing knowledge to help them purchase what they need for their project, helping them load their product on their cart, [and] if need be taking them up front" and helping them load the product into their cars. (Cert. of Michael H. Berg, Esq. in Opp. to Def.'s Mot. for Summ. J. (hereafter, "Berg Cert."), Ex. 5 at 34:6-21.)  Even Plaintiff testified that when a customer seeks to purchase carpet or tile, the salesperson would set the product on the cart for the customer.  (Lord Cert., Ex. R at 86:21-25, 87:13-16.)

Given the foregoing testimony, it appears there is no genuine dispute that lifting products onto a customer's cart and, if necessary, into the customer's car is an essential

16

function of employees in the Flooring Department.  However, the extent of lifting required to be able to adequately assist customers is not so clear.

Defendant argues that "heavy" lifting was an essential function of the Flooring Specialist position.  (Def.'s Br. in Supp. of its Mot. for Summ. J. (hereafter, "Def.'s Br.") 8.) Defendant specifically contends that the Flooring Department is "one of the most lifting-intensive departments in a Lowe's store" because the "product in the Flooring Department is very heavy."  (Cert. of Fredrick J. Cassi in Supp. of Def.'s Mot. for Summ. J. (hereafter, "Cassi Cert.") ¶ 5.)  Products in the Flooring Department include porcelain and ceramic tile, bags of grout, carpet, laminate, vinyl, hardwood, and other forms of flooring.  (Def.'s SOF ¶ 9; Pl.'s Opp. ¶ 9.)

Defendant cites to a report by Plaintiff's physical therapist, in which he wrote that Plaintiff's job "requires loading carts, stocking shelves, lifting up to 100 to 150 lbs, and significant overhead reaching and lifting."  (Lord Cert., Ex. W.)  Defendant similarly cites to a letter from Plaintiff's orthopedist, who wrote that Plaintiff's job "was very physical. He was lifting, carrying and climbing."  (Lord Cert., Ex. X.) Defendant argues that these letters merely recount Plaintiff's own description of his job requirements, and thus they

17

purportedly demonstrate Plaintiff's admission that heavy lifting is an essential function of the job.  (Def.'s Br. 7-8.)

Plaintiff, however, has provided the Nieradka's testimony[4] which does not support Defendant's argument that lifting products weighing more than fifty pounds is required in the Flooring Department.  Although Nieradka states in a certification that "[h]eavy lifting is an essential function of the Flooring Specialist position," she testified at her deposition that she can only lift fifty pounds as high as her waist.  (Cert. of Holly Nieradka in Supp. of Def.'s Mot. for Summ. J. ¶ 5; Berg Cert., Ex. 5 at 47:18-21.)  She further testified that there were items in the department that she was unable to lift by herself.  (Id. at 35:5-7.)  These items included boxes of tiles measuring eighteen inches square and twenty-four inches square, which Nieradka estimated to weigh more than fifty pounds.  (Id. at 33:21-25, 35:8-12.)  Nieradka also testified that she was only able to lift boxes of twelve by twelve inch tiles, which she estimated to weigh approximately fifty pounds, three feet off of the ground.  (Id. at 33:19-20, 36:15-25.)  She admitted that she was unable to lift hardwood flooring onto a customer's cart if it was on a bottom shelf.

---

[4] Although Nieradka was a department manager, she testified that her duties were the same as those of a sales specialist and additionally included clerical duties.  (Berg Cert., Ex. 5 at 34:17-25.)

18

(Id. at 43:4-10.)  When Nieradka was unable to lift a product by herself, she would seek assistance from another employee working nearby, or by calling on the phone for an employee to help. (Id. at 35:24-36:14.)

In light of Nieradka's testimony, as well as the written job description for the position of Sales Specialist, there is a genuine dispute as to whether the ability to lift products weighing more than fifty pounds is an essential function of a Flooring Department employee.  Although working in the Flooring Department may require "heavy" lifting, Defendant does not provide an objective measure of the lifting requirement for that department.  "Heavy" does not necessarily mean "more than fifty pounds."  Because Nieradka stated that "heavy" lifting is an essential function of a Flooring Department employee, but she requires assistance lifting products weighing more than fifty pounds, then it would appear that "heavy" lifting may not require the ability to lift more than fifty pounds.  The written job description supports this conclusion, as it states that an employee must be able to move "items weighing up to 50 pounds without assistance."  (Lord Cert., Ex. G.)

Furthermore, the record makes clear that there were products in the Flooring Department that Nieradka was unable to lift without assistance, yet there appears to be no question that she was able to perform the "essential" functions of the

19

job.  Defendant notes that Nieradka could lift bags of mortar
and rolls of carpet, presumably in an effort to demonstrate that
she could lift items weighing more than fifty pounds even though
Defendant does not provide evidence of the weight of these
items.  (Def.'s Reply Br. in Further Supp. of its Mot. for Summ.
J. (hereafter, "Def.'s Reply Br.") 8-9.)  But regardless of
whether Nieradka could lift more than fifty pounds, it is
undisputed that there were products in the department that she
could not lift, and she sought assistance from other employees
whenever necessary.[5]  Therefore, although the Flooring Department
may contain heavier products than other departments, there is a
question of fact as to whether lifting more than fifty pounds,
without assistance, is an essential part of providing assistance
to customers in that department.  The extent of lifting that is

---

[5] Defendant attempts to establish that Plaintiff could not rely
on assistance from other employees to help with lifting, stating
that the store in Mantua was a "low volume" store and that
Plaintiff was sometimes the only employee in his department.
(Def.'s SOF ¶ 14.)  However, Cassi testified that "generally"
there are two employees in the Flooring Department.  (Lord
Cert., Ex. S at 34:3-8.)  Moreover, even on those occasions when
there was only one employee in the Flooring Department, any
employee could seek assistance from associates in other
departments to help with heavier items as attested to by
Nieradka and another employee, Allison Davis.  (Berg Cert., Ex.
5 at 35:24-36:14; Supp. Cert. of Raquel S. Lord, Esq., Ex. A at
22:17-23:5.)  In light of this testimony, even assuming
Plaintiff was the only employee in the Flooring Department, this
fact does not demonstrate that Plaintiff would have been unable
to obtain assistance from another Lowe's employee to assist a
customer.

"essential" to a Flooring Specialist position will have to be resolved by a jury.[6]

### ii. Lifting Above Chest Height and Climbing

Plaintiff had other physical restrictions, because he could not lift anything more than ten pounds above chest height nor could he climb a ladder. As set forth below, there is a genuine issue of fact as to whether climbing a ladder and lifting products weighing more than ten pounds above chest height were "essential" to the Flooring Specialist position.

There is no dispute that products were stored above chest height. Defendant contends that these products would need to be brought down during the course of a sale if a customer wanted to purchase them. (Def.'s Br. 9.) In support of this assertion, Defendant provided the Certification of Cassi, the store manager, in which he states that assisting a customer "routinely requires reaching up to pull down from shelves items weighing more than 10 pounds." (Cassi Cert. ¶ 7.) Defendant also

---

[6] The Court notes Defendant's argument that Plaintiff reported to his treating physician that he lifted heavy items prior to his injury. (Def.'s Br. 7). It is possible that Plaintiff chose to lift heavy items by himself rather than seek assistance, but his preference does not demonstrate that heavy lifting is an essential function of the job. Indeed, if Nieradka needed assistance with items weighing more than fifty pounds, a jury may conclude that lifting items heavier than fifty pounds is not an essential function of the job.

contends that products would need to be brought down at night so that the shelves would be restocked for the following day, which the parties refer to as "zoning."  (Def.'s Br. 9.)

With respect to assisting a customer, it is undisputed that customers must be assisted with placing products in their carts, which would presumably include assistance with products located above chest level.  The record, however, contains evidence that a Flooring Specialist would not have to lift products above chest height for the purpose of assisting customers.  Both Plaintiff and Nieradka testified that machines were available to assist with moving product down from top stock.  Nieradka specifically testified that an employee could use machinery or a ladder to put the product up without going above his or her shoulder.  (Berg Cert., Ex. 5 at 32:10-13.)  She also testified that if products were on the top shelf, she would bring the product down with equipment.  (Berg Cert., Ex. 5 at 32:10-23, 44:13-17.)  Plaintiff similarly testified that when products needed to be brought down from the top shelves, he would use a small forklift called a "reach truck."  (Lord Cert., Ex. R at 85:11-21.)  The facts do not indisputably establish that a Sales Specialist in the Flooring Department would have been required

to climb a ladder or lift products above chest level for the purpose of assisting customers.[7]

A Flooring Specialist was, in addition to assisting customers, required to do "zoning" tasks, which included pulling "heavy" items down from top shelves and placing them on lower shelves, as well as "front and facing" the product. (Def.'s SOF ¶ 11.) However, the record demonstrates that machines were available to assist with these tasks, such that Plaintiff would not have been required to climb a ladder or lift heavy products

---

[7] Defendant submitted a Supplemental Certification from Cassi in which he states that "Lowe's prefers not to have associates using equipment/machinery during the day if it can be avoided, to prevent injuries to customers." (Supp. Cert. of Fredrick J. Cassi in Supp. of Def.'s Mot. for Summ. J. (hereafter, "Supp. Cassi Cert.") ¶ 4.) Cassi also states that "there is equipment that can be used for product on shelves 8 feet high and above, but this does not do away with the need for associates to reach above their shoulders/heads for product located under 8 feet." (Id. ¶ 5.) This evidence is contrary to the testimony of Nieradka and Plaintiff, both of whom testified that an employee would not have to lift above shoulder level. (Berg Cert., Ex. 5 at 32:3-13; Lord Cert., Ex. R at 112:17-18, 138:8-9.) The facts thus remain disputed and cannot be resolved on summary judgment. In addition, Cassi states that machines do not alleviate the need to lift products because products must be loaded onto the machine or unloaded into a cart by hand. (Supp. Cassi Cert. ¶¶ 6-8.) Cassi does not state whether the products on the top shelf weigh more than fifty pounds. Further, given the Court's finding above that there are questions of fact about the extent of "heavy" lifting that is "essential" to the Flooring Specialist position, the Court cannot conclude from the record that an ability to move products weighing more than fifty pounds from the top stock onto machines is an essential element of the job.

above chest level.  (See, e.g., Lord Cert., Ex. R at 85:5-21; Berg Cert., Ex. 5 at 45:4-7.)

Defendant also employed Customer Service Associates, whose written job description required them to "[k]eep shelves fully stocked, fronted according to planogram and correctly priced." (Berg Cert., Ex. 21.)  The Court acknowledges the testimony of various employees who all indicated that the duties of employees -- whether CSAs, Sales Specialists, or department managers -- were the same irrespective of job title, but the written job description makes clear that keeping shelves stocked is a function of CSAs rather than Sales Specialists.  This discrepancy in the written job descriptions raises a question of fact as to whether the "zoning" tasks are essential to a Flooring Specialist position; indeed, if they were so essential one is left to question why these tasks were written in the job description for CSAs but not Sales Specialists.

The foregoing evidence demonstrates that disputed facts remain concerning the "essential" functions of the Flooring Specialist position and whether Plaintiff was able to perform the "essential" functions of that position in light of his disability.

24

### b.   Plaintiff Suffered an Adverse Employment Decision

Defendant also challenges the third prong of Plaintiff's prima facie case of discrimination by arguing that Plaintiff was not constructively discharged. (Def.'s Br. 13.) Defendant asserts that Plaintiff, to succeed on his claim, must demonstrate that the conditions of his employment were "so intolerable" that a reasonable person subject to them would resign. (Id.) According to Defendant, Plaintiff cannot satisfy this burden because the record demonstrates that Defendant engaged in the interactive process and offered Plaintiff a reasonable accommodation as a CSA at the front desk, and that Plaintiff unreasonably quit his job despite needing the salary and health benefits that it provided. (Id.)

The term "adverse employment action" has been broadly defined to include not only readily quantifiable losses such as loss or reduction of pay or monetary benefits, but other consequences adverse to the employee. Mandel v. M & Q Packaging Corp., 706 F.3d 157, 169-70 (3d Cir. 2010)(Third Circuit identified objective factors indicative of constructive discharge, including demotion or reduction in pay or benefits, involuntary transfer to less desirable position, and alteration of job responsibilities). The Court finds that Plaintiff suffered an "adverse employment action" here because he was

25

offered a job that paid less per hour than he had been paid as a Flooring Specialist.

>          **c.  Defendant Fails to Offer a Non-Discriminatory Reason for Moving Plaintiff to a Position as a CSA at the Front Desk**

Having found that there are sufficient questions of fact as to the "essential" functions of a Flooring Specialist and whether Plaintiff could perform such functions, and having concluded that Plaintiff suffered an "adverse employment action,"[8] the Court next turns to whether Defendant had a legitimate, non-discriminatory reason for moving Plaintiff from the Flooring Department to the front desk position.  Defendant does not dispute that Plaintiff was moved because of his permanent physical restrictions.  This is not a case where there were other reasons that Plaintiff was demoted, such as unexcused absences, insubordination, or poor job performance.  Defendant argues that its action was not discriminatory, though, because Plaintiff was unable to perform the essential functions of the Flooring Specialist position.

---

[8] As to the fourth factor of a prima facie case of discrimination, neither party addresses whether Defendant sought to, or did fill the position with a similarly-qualified person. This element does not appear to be in dispute. Accordingly, the Court concludes that Plaintiff has met his initial burden under McDonnell Douglas, and the burden thus shifts to Defendant.

As the Court already concluded, there are questions of fact concerning the essential functions of the Flooring Specialist position and whether Plaintiff could have performed the essential functions of the position.  Therefore, at this time, the Court cannot find that Defendant's actions were not discriminatory.  Indeed, if a jury determines that Plaintiff could have performed the essential functions of the job, and Defendant removed Plaintiff from his position as a Flooring Specialist based on his physical condition, then Defendant's actions would have been discriminatory.  Given the factual disputes in this case, the Court at this time cannot grant judgment as a matter of law in favor of Defendant on Count One of the Second Amended Complaint.

### 2.  Failure to Accommodate Claim

Even if Plaintiff was unable to perform the essential functions of a Flooring Specialist, there remains a dispute of fact as to whether Defendant engaged in the interactive process in good faith in attempting to find a reasonable accommodation for Plaintiff's disability.

In order to prevail on a failure to accommodate claim under the NJLAD, a plaintiff must establish four elements:

> (1)  he was disabled and his employer knew it;
> (2)  he requested an accommodation or assistance;

27

       (3)  his employer did not make a good faith
            effort to assist; and
       (4)  he could have been reasonably
            accommodated.

Armstrong v. Burdette Tomlin Mem. Hosp., 438 F.3d 240, 246 (3d Cir. 2006) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 317–320 (3d Cir. 1999); Tynan v. Vicinage 13, 351 N.J. Super. 385, 798 A.2d 648, 657, 659 (2002)).  When an employee requests an accommodation for his disability, the employer has a responsibility "to 'engage the employee in the interactive process of finding accommodations.'"  Id. (quoting Taylor, 184 F.3d at 319).  "If an 'employee could have been reasonably accommodated but for the employer's lack of good faith,' the employee will win on his failure to accommodate claim."  Id. (quoting Taylor, 184 F.3d at 319-20).

Defendant argues that Plaintiff's failure to accommodate claim fails under the third prong, because Defendant purportedly engaged in the interactive process in good faith.  (Def.'s Br. 14.)  Plaintiff contends that Defendant demonstrated a lack of good faith in finding an accommodation for Plaintiff.  Plaintiff specifically argues that the process utilized by Defendant in determining an accommodation was not "interactive," because Defendant offered only one option, refused to consider other positions when Plaintiff rejected the one position offered to him, and declined to engage in back-and-forth discussions to

come to a reasonable accommodation.  (Pl.'s Br. in Opp. to
Def.s' Mot. for Summ. J. (hereafter, "Pl.'s Br.") 6-11.)[9]
Plaintiff asserts that he could have been reasonably
accommodated had Defendant engaged in the interactive process in
good faith.  (Id. at 11-20.)

The interactive process requires that employers make a good
faith effort to seek accommodations.  Taylor, 184 F.3d at 317.
"Employers can show their good faith in a number of ways, such
as taking steps like the following: meet with the employee who
requests an accommodation, request information about the
condition and what limitations the employee has, ask the
employee what he or she specifically wants, show some sign of
having considered employee's request, and offer and discuss
available alternatives when the request is too burdensome."  Id.

In this case, the Court finds a dispute of fact concerning
Defendant's good faith efforts to engage in the interactive
process.  The Court recognizes that Defendant accommodated
Plaintiff temporarily following his injury, but once Plaintiff
reached maximum medical improvement Defendant may not have
engaged in the interactive process in good faith.  Based on the
evidence of record, Plaintiff's only involvement in the

_____

[9] Plaintiff also argues that Weatherill improperly restricted
Plaintiff's response on the ADA Accommodation form to address
accommodations for the Flooring Specialist position, which
limited the interactive process.  (Pl.'s Br. 4-5.)

interactive process was his completion of the ADA Accommodation Request Form.  Ortley, the Area Human Resources Manager, was provided paperwork from the store Human Resources Manager, and never spoke directly with Plaintiff or sought input from Weatherill or Cassi concerning possible accommodations.  (See Lord Cert., Ex. T at 33:17-22, Ex. U at 77:18-78:5; Lord Cert., Ex. S at 19:2-9.)

When the CSA position was offered to Plaintiff, and he rejected it due to the decrease in pay, there was no further discussion of the matter.  In this regard, when Weatherill relayed to Ortley that Plaintiff could not afford to take a paycut, she was "directed that that was the position that we had that would accommodate him," and that there was no consideration of any other alternatives at that time.  (Lord Cert., Ex. T at 21:11-14, Ex. U at 69:14-17, 70:10-13.)  There is no evidence that Defendant ever asked Plaintiff what accommodations he was seeking, no evidence that Defendant ever considered Plaintiff's request to work in a different department, and no evidence of any effort to discuss available alternatives once the CSA front desk position was offered and rejected.  Viewing the evidence in a light most favorable to Plaintiff, the Court cannot conclude that Defendant's unilateral ultimatum constituted a good faith effort to engage in the interactive process.

30

Even where an employer fails to engage in the interactive process to find an accommodation, a plaintiff must nonetheless identify a specific accommodation that could have been made. Although the plaintiff need not identify a specific accommodation at the time he requests assistance from his employer, in litigation he has the burden of proving that a reasonable accommodation existed. Donahue v. Consol. Rail Corp., 224 F.3d 226, 234-35 (3d Cir. 2000); Sinclair v. Domb Lighting & Elec. Supply Co., No. A-4903-07T2, 2009 WL 1118813, at *7 (N.J. Super. Ct. App. Div. Apr. 28, 2009). As explained in Sinclair, a plaintiff has "litigation tools available to him, including discovery from the employer and the assistance of counsel, to investigate facts and the law. Through those tools, the employee can and should determine what the employer could have done to accommodate his specific needs." Id.

Plaintiff submits a listing of jobs that were posted for the Mantua store at the time Defendant was considering accommodations for Plaintiff's disability. Plaintiff notes that there was an open position for a Sales Specialist in the Cabinet Department between March 26, 2012 and July 9, 2012.[10] (Berg Cert., Ex. 19.) Defendant's area Human Resources manager,

_____

[10] Plaintiff completed the ADA Accommodation Request Form on March 28, 2012 and was offered the CSA front desk position on June 2, 2012.

31

Ortley, testified generally that she considered the positions
available in the store that would accommodate Plaintiff's
lifting restrictions (Lord Cert., Ex. T at 20:5-13), but she did
not specifically identify each position that was considered and
the reasons Plaintiff did not qualify for those positions.

Defendant, with its Reply Brief, submits a Certification of
Ortley in which she states that Plaintiff was not qualified for
the position in the Cabinet Department because he did not have
"the necessary background experience in kitchen design" or the
software program used to design kitchens for customers.  (Cert.
of Karen Ortley ¶¶ 3-4, May 15, 2014.)  Ortley did not recall
ever "hiring or promoting" an individual to the position of
Cabinet Specialist who did not "already have a solid design
background."  (Id. ¶ 5.)

Ortley's certification does not resolve a number of
questions that are material to a determination of whether
Plaintiff could have been accommodated.  The Court first notes
that it is not clear that Plaintiff was ever specifically
considered for the Cabinet department position.  At her
deposition, Ortley testified that she considered the CSA front
desk position and a cashier position for Plaintiff as an
accommodation, and that she did not believe there were other
positions available that would accommodate Plaintiff's

32

restrictions.  (Lord Cert., Ex. T at 20:14-19.)[11]  It appears
that Ortley at first considered only the cashier position, based
on her experience that another employee previously had a lifting
restriction and had been offered a cashier position to
accommodate the disability.  (Id. at 20:5-10.)  When Defendant's
Accommodation Specialist, Brenda Ricketts, advised Ortley to try
to find a position with a higher salary, Ortley at that time
determined that she would offer the CSA front desk position.
(Id. at 25:8-17.)  Ortley notably never testified that Plaintiff
was considered for the Cabinet position but was rejected due to
a lack of qualifications.  Additionally, although Ortley
purportedly spoke with Weatherill about available positions,
Weatherill did not know whether Plaintiff had ever been
considered for any Sales Specialist positions.  (Lord Cert., Ex.
U. at 67:2-6.)

     Moreover, although Ortley testified that she personally
never hired or promoted someone in the Cabinet Department who
did not have a background in design, her testimony does not make
clear that she is the individual in charge of hiring and

---

[11] Defendant states in its reply brief that Ortley "looked at the
available Sales Specialist positions at the time of the
interactive process . . . and determined that Plaintiff was not
qualified for the open lateral positions, either due to his
inability to lift or his lack of background experience[.]"
(Def.'s Reply Br. 2-3.)  The evidence of record does not support
this assertion as discussed infra.

determining whether an applicant is qualified for a particular position.  Therefore, while she may not have hired an employee for the Cabinet Department who did not have a background in design, this evidence does not foreclose the possibility that other personnel might have hired someone for the Cabinet department who did not have a background in kitchen design.[12]

The Court also notes that Plaintiff has presented evidence that he has a background in kitchen design.  In opposition to summary judgment, Plaintiff submits a certification in which he states that he "assisted with designing and remodeling kitchens, and installed hundreds of kitchens, including kitchen cabinets." (Berg Cert., Ex. 7 ¶ 29.)  Defendant contends that Plaintiff's statement concerning his kitchen design experience is not worthy of credence.  (Def.'s Reply Br. 5.)  Defendant cites to Plaintiff's deposition testimony, wherein he described his prior

---

[12] In discussing the procedure by which he was hired, Plaintiff testified that he met with a sales manager named Mike Deal, a human resources manager named Mary, and Cassi.  (Lord Cert., Ex. R at 47:1-48:7, 49:9-17.)  According to Plaintiff, Cassi "seemed to be impressed" with Plaintiff's experience and offered Plaintiff a job the same day.  (Id. at 49:11-15.)  Notably, Ortley was the Area HR Manager at the time, and she testified that her duties were "overall HR functions of 19 stores."  (Lord Cert., Ex. T at 10:10-14.)  Based on these facts, and construing all inferences in favor of Plaintiff, the Court cannot conclude that Ortley was responsible for determining the qualifications of job applicants.  As such, her testimony that she did not hire applicants who lacked a background in kitchen design does not resolve the disputed issue of whether Plaintiff was qualified to perform the position of Sales Specialist in the Cabinet department.

experience as "replacing doors, fixing drywall leaks, that kind of stuff." (Lord Cert., Ex. R at 27:1-4.) Defendant argues that Plaintiff never identified experience with kitchen design in his deposition, which purportedly demonstrates that Plaintiff was not qualified to work in the Cabinet department. (Def.'s Reply Br. 4-5.)

Under the "sham affidavit" doctrine, a party may not create an issue of fact to overcome summary judgment by filing an affidavit contrary to his prior sworn testimony, without offering a plausible explanation for that conflict. Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004). In this case, Plaintiff's deposition testimony and affidavit are not at odds and can be construed together. Plaintiff's failure to identify kitchen design at his deposition does not mean that he did not have experience in this area. Indeed, Plaintiff did not testify that his prior experience included electrical work, plumbing, exteriors, or flooring, but Plaintiff clearly had sufficient knowledge of these areas since Defendant assigned him to these departments during the course of Plaintiff's employment with Lowe's. The issue to which Defendant points is more properly characterized as a discrepancy in Plaintiff's testimony, which bears on Plaintiff's credibility and is a matter properly reserved for cross-examination.

35

The Court finds that there is genuine dispute of fact as to whether Plaintiff was qualified for the Cabinet position. Given Plaintiff's background as a general contractor and his apparent knowledge of numerous areas of home improvement, and construing the evidence in a manner favorable to Plaintiff, the Court is unable to determine that Plaintiff was not qualified for a position in the Cabinet department.[13]  As such, the Court cannot conclude as a matter of law that Plaintiff could not have been reasonably accommodated by transferring him to the position of Sales Specialist in the Cabinet department.  The Court will l deny Defendant's motion for summary judgment on Plaintiff's claim for failing to engage in the interactive process in good faith under the NJLAD.

---

[13] There is also an issue as to whether Plaintiff could have learned the computer program utilized by Defendant to design kitchens.  Sharon Rubino, who works in the Cabinet department, testified that anyone could learn the computer program with proper training.  (Berg Cert., Ex. 6 at 61:18-24.)  Therefore, it does not appear Plaintiff's lack of experience with the computer program would have been an impediment to his ability to work in the Cabinet department.

**IV.  <u>CONCLUSION</u>**

For the foregoing reasons, Defendant's motion for summary judgment will be denied.

An Order will be entered consistent with this Opinion.


  <u>  s/ Noel L. Hillman  </u>
  NOEL L. HILLMAN, U.S.D.J.

Dated: December 17, 2014

At Camden, New Jersey